UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| STEVAN LAMLEY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO.  3:12cv595 |
| | ) | |
| OFFICER JUSTIN LENTZ, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the defendant,

Office Justin Lentz ( "Officer Lentz" or "Lentz"), on March 5, 2014.  The plaintiff, Stevan

Lamley ("Lamley"), filed his response on May 14, 2014, to which Lentz replied on May 28,

2014.

Also before the court is a motion to strike brief, filed by Lentz on May 28, 2014, to which

Lamley responded on May 29, 2014.  Lentz declined to file a reply.

For the following reasons, both motions will be granted.

Summary Judgment

Summary judgment must be granted when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine

issue of material fact exists when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Not every dispute between the parties precludes summary judgment, however, since "[o]nly

disputes over facts that might affect the outcome of the suit under the governing law" warrant a

trial. Id. To determine whether a genuine issue of material fact exists, the court must construe all

facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003). A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010).

Discussion

Lamley filed this action pursuant to 42 U.S.C. § 1983 alleging Lentz used excessive force during Lamley's arrest. Lamley is also pursuing a state law battery claim against Lentz. Lentz requests summary judgment on all claims.

The defendants present the following facts which are supported by the affidavits of Lentz and Greg Church, the Chief of Police for the Town of North Webster. On October 16, 2010, Officer Lentz, with the North Webster Police Department, was dispatched to the American Legion, 756 S. Main St., North Webster, Indiana, to investigate a hit/skip car crash. (Aff. of Lentz, ¶ 4, 5). When Officer Lentz arrived, he found a Silver Nissan Sentra and spoke with the car's owner, Craig Streby, who was an employee of the Legion. (Aff. of Lentz, ¶ 5). Craig stated that someone had witnessed a white truck hit his vehicle and leave the scene, and came inside to tell him. (Aff. of Lentz, ¶ 5). Craig advised that Dan Conkling was the witness and that Dan was inside. (Aff. of Lentz, ¶ 5).

After noting all the pertinent information from Craig's vehicle, Officer Lentz went to the front door where Dan Conkling and his wife, Becky, were waiting to speak with him. (Aff. of Lentz, ¶ 6). Dan and Becky Conkling stated that as they were pulling into the parking lot of the Legion, they saw a white Chevrolet pickup strike a silver car while backing up. (Aff. of Lentz, ¶

6). They stated that after the white truck hit the other car, it pulled out as if to leave the parking lot, and sat for a moment at the exit to the lot. (Aff. of Lentz, ¶ 6).

The Conklings stated that before the white Chevrolet pulled onto Main Street to leave, they pulled around and noted the license plate of the pickup, which read: "In God We Trust YE38S2". (Aff. of Lentz, ¶ 7). They also stated that the white truck had some sort of rack on the back attached to the truck by the hitch. (Aff. of Lentz, ¶ 8). The rack was possibly for carrying deer. (Aff. of Lentz, ¶ 8).

Officer Lentz was advised by Dispatch that the license plate number he received from the Conklings was the same license plate Dispatch had received from the initial caller. (Aff. of Lentz, ¶ 9). The license plate belonged to a Stevan W. Lamley and Kim Chin, of Fort Wayne. (Aff. of Lentz, ¶ 9). Craig Streby also stated that he believed that the vehicle belonged to Steven W. Lamley with an address of 9378 Koher Rd, Syracuse, Indiana. (Aff. of Lentz, ¶10). Craig Streby advised Officer Lentz that Lamley was a member of the Legion Post in North Webster. (Aff. of Lentz, ¶10). Craig also provided Office Lentz with a phone number for Lamley and the address from the Legion's records. (Aff. of Lentz, ¶10).

After speaking with the witnesses and victim, Officer Lentz called Dispatch with that information, and advised them he was en route to the Koher Rd. address. (Aff. of Lentz, ¶11). Officer Lentz requested a Kosciusko County Sheriff's Department unit to go with him, as the people he spoke to at the Legion advised that Lamley was known to be "mouthy". (Aff. of Lentz, ¶11).

Deputy Terry Swoverland and Deputy Steve Cooper of the Kosciusko County Sheriff's Department met Officer Lentz near the address on Koher Rd. (Aff. of Lentz, ¶12, Aff. of Church,

Exhibit "1"). The Officers then proceeded to 9378 E. Koher Rd. S., the residence of Stevan

Lamley. (Aff. of Lentz, ¶12, Aff. of Church, Exhibit "1"). Upon arriving at the house, Officer

Lentz noted a 1995 Chevrolet pickup, white, with a metal carrier rack attached to the rear of the

truck, just as was described to him as the suspect vehicle. (Aff. of Lentz, ¶13).

Officer Lentz, along with Deputy Swoverland and Deputy Cooper, knocked on the front

door of the house several times, but no one came to the door. (Aff. of Lentz, ¶14, Aff. of Church,

Exhibit "1"). Officer Lentz could hear music coming from a detached garage, but he was unable

to locate anyone at that building either. (Aff. of Lentz, ¶14).

Deputy Swoverland and Officer Lentz walked around the house to check the doors and

windows to see if anyone was inside or at the back of the house. (Aff. of Lentz, ¶15, Aff. of

Church, Exhibit "1"). When they got to a sliding glass door on the east side of the house, Officer

Lentz knocked and heard a male subject inside yell to get the fuck off his property or he was

going to shoot them. (Aff. of Lentz, ¶16, Aff. of Church, Exhibit "1"). Deputy Swoverland and

Officer Lentz identified themselves as Police and Sheriff's department, and said they needed to

talk to him outside. (Aff. of Lentz, ¶17, Aff. of Church, Exhibit "1"). The male subject again told

them to get the fuck off his property or he was going to shoot them. (Aff. of Lentz, ¶17, Aff. of

Church, Exhibit "1").

Officer Lentz notified dispatch that they had made contact with a subject from inside the

house and that he was threatening them with violence. (Aff. of Lentz, ¶18, Aff. of Church,

Exhibit "1"). Deputy Swoverland and Officer Lentz made their way back around to the front of

the house, when Officer Lentz heard Deputy Cooper yelling "He's got a gun!" (Aff. of Lentz, ¶19,

Aff. of Church, Exhibit "1"). Officer Lentz immediately took cover behind one of the Deputies'

cars, which was parked in the roadway in front of the house, and notified dispatch that he had a

subject with a gun at the scene. (Aff. of Lentz, ¶20). Officer Lentz could not see the subject at

that time, due to trees in the yard, so he moved up behind his car, near Deputy Swoverland and

Deputy Cooper. (Aff. of Lentz, ¶21, Aff. of Church, Exhibit "1").

From there, Officer Lentz observed an older male subject near the garage at the south

west corner of the residence. (Aff. of Lentz, ¶22"). The male subject had a small metallic colored

handgun in his hand and was stumbling around in the grass and the driveway. (Aff. of Lentz,

¶22). Officer Lentz, along with Deputy Swoverland and Deputy Cooper, ordered the subject to

put the weapon down several times, but the subject did not follow the commands. The subject

was holding the gun in his hand and walking around. (Aff. of Lentz, ¶23, Aff. of Church, Exhibit

"1"). It appeared from the way the subject was walking that he was intoxicated. (Aff. of Lentz,

¶23, Aff. of Church, Exhibit "1").

At one point the suspect placed the weapon in his front pants pocket, and then turned his

back toward the Officers. (Aff. of Lentz, ¶ 25). While his back was turned, Officer Lentz could

see him move his hand back towards his pocket where the gun was. (Aff. of Lentz, ¶25). When

he turned back towards the Officers, he removed the gun from his pocket, but did not point it at

anyone. (Aff. of Lentz, ¶25).   After several more times of being ordered to put down the weapon,

the suspect did so, placing it on the railing of the porch on the house. (Aff. of Lentz, ¶26, Aff. of

Church, Exhibit "1"). The suspect then moved a few steps away from the gun. (Aff. of Lentz,

¶26, Aff. of Church, Exhibit "1"). He was ordered to get on the ground, and to place his hands in

the air. (Aff. of Lentz, ¶27, Aff. of Church, Exhibit "1").

Officer Lentz was unsure if the suspect had any other weapons on his person. (Aff. of

Lentz, ¶28, Aff. of Church, Exhibit "1"). The Officers ordered him to the ground several more times, but the suspect did not make any attempt to follow their directions. (Aff. of Lentz, ¶28, Aff. of Church, Exhibit "1"). Officer Lentz holstered his firearm and drew his Taser from his belt. (Aff. of Lentz, ¶ 29). Officer Lentz moved from behind his car to within 10-15 feet of the suspect. (Aff. of Lentz, ¶ 29). Officer Lentz advised the subject that if he did not get down on the ground, he would deploy the Taser on him. (Aff. of Lentz, ¶ 29).

After several more attempts to get the suspect to obey his verbal commands, the suspect turned his back towards Officer Lentz. (Aff. of Lentz, ¶ 30). At that time, Officer Lentz deployed the Taser against the suspect, with the dart probes hitting him in the back, one between the shoulder blades, and one just above his waistband in his lower back. (Aff. of Lentz, ¶ 31). When the probes made contact, the suspect locked up, and when the device shut off after *5* seconds, Officer Lentz grabbed the suspect by the arm and lowered him to the ground to avoid any injury from falling. (Aff. of Lentz, ¶ 32, Aff. of Church, Exhibit "2").

After the suspect was on the ground, Deputy Cooper came up and handcuffed the suspect (Aff. of Lentz, ¶ 33, Aff. of Church, Exhibit "1"). Officer Lentz advised Dispatch of the Taser deployment and requested medics to make the scene to check the suspect. (Aff. of Lentz, ¶ 33). Once the suspect was secured, and searched for other weapons, Officer Lentz asked him for his name, which he stated was Stevan Lamley. (Aff. of Lentz, ¶ 34). It was evident that Lamley had been drinking due to his speech and very strong odor of alcoholic beverages on his breath. (Aff. of Lentz, ¶ 35).

Officer Lentz read Lamley his Miranda rights and he declined to answer any questions. (Aff. of Lentz, ¶ 36). Lamley then became very belligerent and verbally abusive. (Aff. of Lentz, ¶

37). He threatened the Officers with legal action, stating they did not have permission to be on his property, and that he had a friend who was a Federal Judge. (Aff. of Lentz, ¶ 38). He asked several times why the Officers were there and they explained to him that they were investigating a hit and run accident at the American Legion in North Webster. (Aff. of Lentz, ¶ 37).

The Deputies secured the pistol which Lamley was carrying. (Aff. of Lentz, ¶ 38, Aff. of Church, Exhibit "1"). It was an AMT Back-Up .380 caliber that was loaded with a round in the chamber. (Aff. of Lentz, ¶ 38, Aff. of Church, Exhibit "1"). Deputy Cooper also corroborated Lentz's testimony that when Lamley exited the house Lamley was waving the gun around and pointing it in Cooper's direction. . (Aff. of Lentz, ¶ 39, Aff. of Church, Exhibit "1").

While medics were checking Lamley, Officer Lentz went back to Lamley's pickup truck and observed silver paint transfer from the vehicle he struck on the metal carrier rack attached to his pickup. (Aff. of Lentz, ¶ 40). The paint transfer was photographed for evidence. (Aff. of Lentz, ¶ 40).

Officer Lentz was then advised that the Officers needed to secure any other weapons in the house for safekeeping. (Aff. of Lentz, ¶ 41). Lamley stated there were a few more shotguns in the closet. (Aff. of Lentz, ¶ 41). Other officers went inside the house to clear it for any other weapons. (Aff. of Lentz, ¶ 41, Aff. of Church, Exhibit "1"). Located in the house were a Ruger 10/22 rifle, a muzzle loader rifle, and two Remington shotguns. (Aff. of Lentz, ¶ 41, Aff. of Church, Exhibit "1"). All were removed from the house and transported to the Sheriff's Dept. to be secured, along with the pistol Lamley was carrying. (Aff. of Lentz, ¶ 41, Aff. of Church, Exhibit "1").

In his response brief Lamley recites a slightly different version of events, as follows. On

October 16th 2010 (Lamley Dep. p. 54), Lamley drank a couple of beers at his sister's and one or two at the Legion *(Id.* 66), and then he went home and drank a bottle of Jack Daniels. (*Id*. 66-67). Lamley was sitting in his living room and heard someone trying to get in so he snuck around to another window and saw someone behind his house in black pants, a black shirt and a gun in his hand. (*Id*. 70-71.) Lamley jumped up and grabbed a gun. (*Id*. 73.) He went out the front door and saw Lentz with a gun in his hand, and did not see anything which would indicate that Lentz was a police officer. (*Id*. 4.) Lamley and Lentz were pointing their guns at each other (*Id*. 76). Lamley did not believe Lentz was a police officer. (*Id*. 83.) Eventually, Lentz talked Lamley into putting down his gun. (*Id*. 84.) Lentz identified himself as an Officer from Webster. (*Id*. 88.) Lentz asked Lamley to put his gun down and Lamley complied. (*Id.* 89.) Lamley put the gun on the railing, moved toward the edge of the garage, and then Lentz came up behind him (*Id*. 93.) Lamley complied with Lentz's commands and put his hands up and away from his body. (*Id*. 94.) Officer Lentz Tased Lamley once and then gave him a second shot and Lamley collapsed and hit his head on the concrete and started bleeding. (*Id*. 94.) Lamley had his hands in the air when he got shot in the shoulder by the Taser. (*Id*. 96.) Lamley was bleeding from his mouth, nose, eye, and ear and he had a wound on his head. (*Id*. 102-03.) Lamley further contends that Lentz hit him with a baton in the back before he Tased him. (*Id*.154-55).

Before getting to the merits of the motion for summary judgment the court will resolve the motion to strike. Lentz first asserts that Lamley's testimony that his "hands were up" must be stricken. In the "Statement of Genuine Dispute" section of Lamley's response, he cites to deposition testimony in which Lamley claims he had his hands in the air prior to allegedly being struck by Officer Lentz. Lentz argues that this evidence is inadmissible for several reasons. First,

this information is not based upon the Lamley's personal knowledge. Rather, he obtained this information from his neighbor, making the statement hearsay. Second, Lamley's testimony is inconsistent. "[A] party cannot defeat summary judgment by having a witness contradict her own prior deposition testimony." *Paton v. MFS/Sun Life Financial Distributors, Inc.*, 480 F.3d 478, 488 (C.A.7 2007), *citing Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 759 (C.A.7 2006). Indiana law recognizes that a change in testimony, in light of a pending motion for summary judgment, may be a ruse; however, in some situations the change is plausible. *Id*. Several scenarios may explain a change in testimony, such as "a confusing deposition question, circumstances indicating a lapse of memory, relevant new information discovered after original testimony, or ambiguous or incomplete earlier testimony." *Id*. (citing references omitted).

In the present case, Lamley claims that he had his hands up when Officer Lentz Tased him and allegedly struck him with a baton. However, in his deposition, Lamley also acknowledges that he might have put his hands in his pockets or in his waist:

> Q:     I just want to try to get where these people are now. So, at
>        any point did you put your hands in your pockets or in your
>        waist?
>
> **A:     I might have. I don't remember.**
>
> Q:     Okay.
>
> **A:     There was shit happening too fast because he wanted to
>        know if I had any other guns on me and I said no.**
>
> Q:     But you might have also put your hands in your pocket or
>        your waist?
>
> **A:     Yes, he might have told me to put them in my pocket, for
>        all I remember.**
> Dep. of Lamley, pg. 196:4-15.

As Lamley's deposition testimony continues, it is clear that Lamley really has no recollection of what occurred and that he is basing his testimony on the information he allegedly obtained from his neighbor:

> Q:    Okay. And then did he come over and try to cuff you. Is that what --
>
> **A:    Yes.**
>
> Q:    Okay. But you had your hand up like this?
>
> **A:     I don't remember.**
>
> Q:    Okay. And then you said he started hitting you with the baton?
>
> **A:    I'm going by Ryan. Ryan's the one that said that I had already surrendered--**

Dep. of Lamley, pg. 196:19-24; 197:1-4

Pursuant to Rule 56, an opposing declaration must be made on personal knowledge. Lentz argues that it is clear that Lamley's statements relating to his hands "being up in the air" are not based upon his personal knowledge.

In response, Lamley asserts that "[t]here is enough testimony in the record to indicate that Lamley does remember . . . having his hands up."  However, Lamley fails to cite to any testimony in the record to support this assertion.  Accordingly, as it is clear that Lamley did not have any recollection of whether his hands were up in the air, the portion of Lamley's brief where he states he had his hands in the air will be stricken.

Next, Lentz argues that Lamley's testimony that Lentz allegedly struck him with a baton must also be stricken due to lack of personal knowledge.  When asked specifically about

allegedly being struck with the baton, Lamley testified:

> Q: And tell me about this stick that you say Officer Lentz hit you with.
>
> **A: He beat me with one of those batons.**
>
> Q: Did you see it?
>
> **A: What?**
>
> Q: The stick that he beat you with?
>
> **A: Oh, no, I felt it.**
>
> Q: Did you see it?
>
> **A: No. I don't remember because he hit me in the back and he was a sneaky sucker. Everything he did was in my back.**

Dep of Lamley, pg. 154:16-25; 155:1-2).

When questioned about it later, Lamley indicated that all the information he had with respect to allegedly being struck by the baton and being Tased came from information he obtained from his neighbor. (Dep. of Lamley, pg: 156:10-24; 157:1-24; 158:1-21). It is clear that Lamley does not remember what transpired the night he was arrested by Officer Lentz. Thus, the court will strike the offending portion of Lamley's brief due to not being based upon personal knowledge.

The court will now return to the issues raised in the motion for summary judgment. Lentz first argues that he did not use excessive force to arrest Lamley. Lentz asserts that Lamley was intoxicated, combative, aggressive, had a handgun near him, and failed to comply with the Officers' reasonable commands.

All excessive force claims stemming from an arrest must be analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. M.S. Conner*, 490 U.S. 386, 395 (1989). This analysis requires an inquiry into "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397. "The 'reasonableness' of a particular use of force must be judged **from the perspective of a reasonable officer on the scene**, rather than with the 20/20 vision of hindsight." *Id*. at 396. (emphasis added). The Supreme Court has instructed that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396. In analyzing excessive force claims, the federal courts consider these factors: 1) the severity of the crime committed; 2) whether the suspect poses an immediate threat to the safety of the officers or others; and 3) whether the suspect is actively resisting the officers or attempting to evade arrest by flight. *Lanigan v. Village of East Hazlecrest*, 110 F.3d 467, 475 (7th Cir. 1997).

"Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. "[T]he same standard of

reasonableness at the moment applies: 'Not every push or shove, even if it later seems unnecessary in the peace of judge's chambers,' violates the Fourth Amendment." *Id*. (internal citation omitted) (*quoting*, *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir. 1973)). .

Lentz argues that it is clear from the facts and circumstances known to Lentz that his use of a Taser on Lamley was objectively reasonable under the *Graham* standard. The "most important" factor under *Graham* is whether the suspect posed an "immediate threat to the safety of the officers or others." *Smith v. City of Hemet,* 394 F.3d 689, 702 (9th Cir.2005). Lentz argues that Lamley posed an immediate threat to the safety of the Officers. He was brandishing a weapon, had threatened to shoot three police officers, refused all of their commands to get on the ground, he was intoxicated and was still within a few feet of a loaded handgun. *See McConnell v. McKillip,* 573 F.Supp.2d 1090, 1102 (S.D.Ind.2008) (finding that Officer's use of force was reasonable given that officers ordered plaintiff to put a board down that he was brandishing, but plaintiff failed to comply with that order.)  Additionally, Lentz points out that Lamley was actively resisting arrest. He refused to get on the ground as instructed by the officers. He had previously threatened to shoot the officers if they did not get off his property. He was intoxicated and had previously been involved in a hit and run accident.

While "reasonableness" is often a cue that the issues presented are matters of fact for a jury to decide, the 7th Circuit has developed a different rule specific to claims of excessive force. In *Kinder v. Gas City Police Department,* the court decided that:

> When material facts are in dispute, then the case must go to a jury,
> whether the argument is that the police acted unreasonably because
> they lacked probable cause, or that they acted unreasonably
> because they responded overzealously or with too little concern for
> safety. But when the material facts (or enough of them to justify

> the conduct objectively) are undisputed, then there would be
> nothing for a jury to do except second-guess the officers, which
> *Graham* held must be prevented. Since *Graham* we have regularly
> treated the reasonableness of force as a legal issue, rather than an
> analog of civil negligence.

*Kinder v. Gas City,* 2012 U.S. Dist. LEXIS 11953 (N.D. Ind. 2012).

Courts, when reviewing similar actions by other police officers, have held that the officers acted reasonably, thus not using excessive force, when presented with similar situations. In *Kinder v. Gas City Police Dept.,* the court found that officers, responding to a domestic violence call, acted reasonably when they Tased a suspect, twice. *Kinder* at 7-8, 10. After a domestic disturbance, the suspect fled the house and hid behind a detached garage. *Id.* at 7. The officers were faced with a suspect, in a dark place, who was potentially armed and refusing to comply with their requests to put his hands in the air. *Id.* 7-8. Summary judgment was granted in favor of the officers on an unnecessary force claim. *Id.* at 10, 12.

In *Magee v. Stitsworth,* the court found that an officer acted reasonably when he Tased a handcuffed arrestee in order to get him into a police car. 2009 U.S. Dist. LEXIS 119897 (N.D. Ind. 2009). The intoxicated arrestee refused to comply with the officer's repeated requests that he place his legs inside the squad car so the door could be shut. *Id.* at 4. After being Tased, the arrestee complied with the request. *Id.* The officer was granted summary judgment on an unreasonable force complaint. *Id.* at 10.

In *Draper v. Reynolds,* 369 F.3d 1270 (11th Cir.2004), a truck driver was pulled over for driving with a faulty tail light. The officer requested that the driver exit the truck and walk back to an area behind the vehicle. The driver initially complied, but then refused to retrieve documents from the cab of his truck despite being asked repeatedly by the officer. *Id.* at 1278,

During the encounter, the driver "was belligerent, gestured animatedly, continuously paced, appeared very excited, and spoke loudly." *Id.* at 1271. After the driver refused the officer's fifth request to retrieve the documents, the officer Tased him once in the chest. *Id.* at 1278. The Court noted that given the driver's actions and demeanor, a "verbal arrest command accompanied by attempted physical handcuffing, in these particular circumstances, may well have, or would likely have, escalated a tense and difficult situation into a serious physical struggle in which either [the officer or driver] would be seriously hurt." *Id.*

Finally, in *Overton v. Hicks*, the court found that an officer acted reasonably when he used his Taser on a diabetic individual for not complying with commands. *Overton v. Officer Robert Hicks, et al.*, 2008 U.S. Dist. LEXIS 47186 (S.D. Ind. 2008). In *Overton*, the diabetic was suffering so badly from hypoglycemia that he crashed the car he was driving and it was resting on a curb. *Id.* at 6, 14. At the time of the incident he was described as "dazed and semiconscious," but because he refused to exit his car, was revving the engine, and was reaching into the car for an unknown purpose, the court found that Tasing the individual to gain control of the situation was not unreasonable and the court granted the officer summary judgment concerning his use of the Taser. *Id.* at 6, 9, 27-8.

In granting summary judgment, each of the Courts above examined similar situations where officers were faced with intoxicated, combative, and aggressive individuals that were resisting arrest or failing to follow the officers' commands. In all those situations, the Courts found the officers' use of a Taser was reasonable under the circumstances. Lentz points out that in the present case, not only was Lentz faced with an intoxicated, combative, aggressive individual that refused to follow his commands, there was also a deadly weapon involved.

In response, Lamley does not explain how the situation in this case is substantially different from situations in the cases cited by Lentz. Lamley merely states, without citation to the record or caselaw, that "it is clear that there are genuine issues of material fact as to whether Lentz's use of force was reasonable". Lamley argues that he may have been intoxicated, but he was not combative or aggressive and he had laid down his gun and was complying with Lentz's instructions.

It is clear to this court that Lentz acted reasonably. There is no admissible evidence that Lamley was complying with commands and Lentz was correct to not risk his life and to Tase Lamley. Even though Lamley had given up the gun he was holding there was no way for Lentz to know if Lamley was still armed with another gun on his person. Consequently, summary judgment for Lentz is appropriate on the excessive force claim.

Next, Lentz argues that, in any event, he is entitled to qualified immunity. "A public official's conduct is protected by qualified immunity when 'the official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known'." *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430 (7th Cir. 1989); *Meyer v. Robinson*, 992 F.2d 734, 738 (7th Cir. 1993). "The objective standard is designed to protect the public interest in deterrence of and compensation for an official's unlawful conduct while safeguarding the official's ability to make difficult decisions with independence and without fear of consequences." *Id*.

A two-step analysis is used to determine whether a defendant is entitled to the protections of the qualified immunity doctrine: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional

16

right?" and (2) "[W]hether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). The inquiry as to the second step "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id*. at 201. However, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009). It is within the trial court's discretion to determine which prong with which it will begin its analysis. *Id*.

The qualified immunity inquiry acknowledges "that reasonable mistakes can be made as to the legal constraints on particular police conduct". *Saucier*, 533 U.S. at 205. It is the plaintiff's burden to show "the existence of a clearly established constitutional right." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994). "Viewed as a whole, the doctrine of qualified immunity erects a substantial barrier for plaintiffs, and appropriately so because qualified immunity is "designed to shield from civil immunity all but the plainly incompetent or those who knowingly violate the law.'" *Id*. at 1177 (*quoting Donovan v. City of Milwaukee*, 17 F.3d 944, 952 (7th Cir. 1994)). The applicability of the qualified immunity doctrine is a question of law. *Hammon v. Kunard*, 148 F.3d 692, 695 (7th Cir. 1998). "Although the privilege of qualified immunity is a defense, the plaintiff carries the burden of defeating it." *Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007).

Lentz argues that he is entitled to qualified immunity under both prongs of the qualified immunity analysis. Lentz argues that even assuming a constitutional violation occurred, it would not have been clear to a reasonable officer that Lentz's conduct was unlawful in the situation he confronted.

There is no question that each citizen possesses a Constitutional right to be free of excessive force by law enforcement. Lentz argues that he did not engage in conduct that obviously constituted excessive force. As explained by the *Kinder* court, "[i]t is clear, at least, that the use of a Taser is not *per se* unconstitutional force." *Kinder* at 11. Lentz concludes that he did not violate a clearly established Constitutional right and is therefore entitled to qualified immunity.

Lentz further argues that even if he could not establish his entitlement to qualified immunity under the first prong of the analysis, he is entitled to qualified immunity under the second prong because no reasonable officer would believe that Lentz's actions were unlawful.

Courts generally hold that the use of a Taser against an actively resisting suspect either does not violate clearly established law or is constitutionally reasonable. *See Clarett v. Roberts,* 657 F.3d 664, 674–75 (7th Cir.2011) (affirming defense verdict where defendant used Taser three times on plaintiff when she blocked the doorway to her son's bedroom after several officers had entered and defendant heard a commotion in the bedroom and believed officers needed help; the second and third Tasings were deployed because plaintiff was kicking and flailing and continuing assaultive behavior as defendant was arresting her); *United States v. Norris,* 640 F.3d 295, 303 (7th Cir.2011) (use of Taser on defendant was reasonable where defendant had "displayed an unwillingness to accede to reasonable police commands, and his actions suggested an intent to use violence to fend off further police action"); *Forrest v. Prine,* 620 F.3d 739, 745–46 (7th Cir.2010) (affirming summary judgment for officer on plaintiff's Fourteenth Amendment excessive-force claim, where plaintiff was a large man in a confined area who was intoxicated, defiant, belligerent, was clenching his fists and yelling obscenities, and had attacked

another officer earlier that evening).

In *Jenkins v. City of Lawrence*, qualified immunity was granted to an officer who Tased an intoxicated individual, twice, for resisting arrest. *Jenkins v. City of Lawrence*, 2011 U.S. Dist. LEXIS 73397 (S.D. Ind. 2011). The suspect backed away from one officer following an argument about whether the individual should return into his apartment. *Id*. at 6-7. The officer felt this was resisting arrest, he and two other officers attempted to take the man into custody, one of the officers, in response to the resistance used his Taser to subdue the suspect so he could be taken into custody. *Id.* at 7-8. The court determined that the circumstances:

> D[id] not clearly demonstrate that the [officers'] conduct was so "patently violative" of the constitutional right that reasonable officials would know without guidance from a court. As such, it is precisely the type of case in which qualified immunity should be applied to protect the officers from liability. The controlled, finite use of the Taser to quickly effectuate [the suspect's] arrest and prevent an escalating incident could not reasonably be found to be knowingly in violation (sic) the law as is required to abrogate qualified immunity.

*Id.* at 17 (internal citations omitted).

Lentz contends that, in the instant case, in light of Lamley's intoxication, failure to obey the Officers' commands, the presence of a handgun, and Lamley's previous threats of violence, Lentz could not have known that a reasonable officer would find the force he used clearly unlawful. According to Lentz, the controlled use of the Taser to effectuate the arrest of Lamley and prevent a potentially deadly incident could not reasonably be found to be knowingly in violation of the law as is required to abrogate qualified immunity.

In the present case it is undisputed that Lamley was intoxicated, that he failed to obey the Officers' commands, that he had a handgun and threatened to shoot Lentz. Under these

circumstances it is clear that Lentz' life was in danger and it was not unreasonable force for him

to use his Taser to subdue Lamley.  Although Lamley claims in his response that the facts in this

case show that Lentz violated his constitutional rights, Lamley does not direct the court to any

facts that dispute the material facts in this case.  Moreover, Lamley has not submitted any case

authority showing that the force used in this case has ever been held to be unreasonable.

This court finds that Lentz is entitled to qualified immunity because, pursuant to the

applicable case law, Lentz did not violate a clearly established constitutional right.  Therefore,

summary judgment is proper on this basis also.

Finally, Lentz argues that he is entitled to summary judgment on Lamley's state law

battery claim.  The Indiana Tort Claims Act ("ITCA") provides immunity to governmental

employees against actions brought against them individually. *Bushong v. Williamson*, 790 N.E.2d

467, 471 (Ind.2003). The purpose of the ITCA is to "ensure that public employees can exercise

their independent judgment necessary to carry out their duties without threat of harassment by

litigation or threats of litigation over decisions made within the scope of their employment."

*Celebration Fireworks, Inc. v. Smith*, 727 N.E.2d 450, 452 (Ind.2000). When the employee's

conduct is "of the same general nature as that authorized, or incidental to the conduct

authorized," it is "within the scope of employment." *Id*.

Indiana Code § 34-13-3-5(b) provides that a "lawsuit alleging that an employee acted

within the scope of the employee's employment bars an action by the claimant against the

employee personally." *McAllister v. Town of Burns Harbor*, 693 F.Supp.2d 815, 822

(N.D.Ind.2010) (quoting IND.CODE § 34– 13–3–5(b)); *see also Miner v. Sw. Sch. Corp.*, 755

N.E.2d 1110, 1114–5 (Ind. Ct. App. 2001) ("In general, a plaintiff may not maintain an action

against a government employee personally if that employee was acting within the scope of his

employment.").

According to the complaint, Officer Lentz was employed by the North Webster Police

Department and acting within the scope of his duties when he encountered Lamley on October

16, 2010. Because Lamley alleges that Officer Lentz acted within the scope of his employment as

to the acts giving rise to the complaint against him, he is immune and the state law claims must

be dismissed.

Moreover, Officer Lentz is shielded from liability pursuant to Ind. Code. § 34-13-3-5(c);

*see also Smith v. Indiana Dep't of Correction*, 871 N.E.2d 975, 986 (Ind. Ct. App. 2007).

Specifically, Indiana Code Section 34–13–3–5(c) provides that, in order to bring a suit against an

employee personally, the plaintiff must "allege that an act or omission of the employee that

causes a loss is (1) criminal; (2) clearly outside the scope of the employee's employment; (3)

malicious; (4) willful and wanton; or (5) calculated to benefit the employee personally." In

addition, the plaintiff's complaint "must contain a reasonable factual basis supporting the

allegations." Id.

In Lamley's Complaint, there is no allegation that Officer Lentz's alleged actions were

criminal; clearly outside the scope of his employment; malicious; or calculated to benefit him

personally. Lamley does make an allegation that Officer Lentz's actions were negligent and/or

willful and wanton. However, there is no evidence to support the claim that Officer Lentz's

actions were willful and wanton.

The term "willful and wanton" is defined by the Indiana Supreme Court as: 1) an

intentional act done with reckless disregard of the natural and probable consequences of injury to

a known person under the circumstances known to the actor at the time; or 2) an omission or failure to act when the actor has actual knowledge of the natural and probable consequence of the injury. *Witham v. Norfolk and Western Ry. Co.*, 561 N.E.2d 484, 486 (Ind. 1990). A Court examining "willful and wanton" misconduct focuses on two elements: 1) the defendant's knowledge of an impending danger or consciousness of misconduct calculated to result in probable injury; and 2) the defendant's conduct must have exhibited an indifference to the consequences of the act. *Id*. Constructive knowledge is not sufficient. *Westray v. Wright*, 834 N.E.2d 173, 181 (Ind. Ct. App. 2005).

Where the allegations are insufficient to support such a claim, Indiana Courts have not hesitated to dispose of such a claim as a matter of law. *See Westray*, 834 N.E.2d at 181; *Prior*, 681 N.E.2d at 771; *U.S. Auto Club, Inc. v. Smith,* 717 N.E.2d 919 (Ind. Ct. App. 1999); *Blackburn v. City of Rochester,* 640 N.E.2d 1068 (Ind. Ct. App. 1994); *Miner v. Southwest School Corp.,* 755 N.E.2d 1110 (Ind. Ct. App. 2001); and *Duncan v. Duncan*, 764 N.E.2d 763 (Ind. Ct. App. 2002).

In the present case, Officer Lentz's conduct was not willful or wanton. Officer Lentz did not commit any act or omission that he knew was improper. There is simply no evidence to support a claim for willful or wanton misconduct on the part of Officer Lentz.

In his response, Lamley does not even discuss Lentz's argument that state law claims against Lentz, individually, are barred by the ITCA. Accordingly, for all the foregoing reasons, Lamley's battery claim fails and summary judgment will be granted in favor of Lentz.

## Conclusion

On the basis of the foregoing, Lentz's motion for summary judgment [DE 31] is hereby

GRANTED.  Further, Lentz's motion to strike [DE 42] is also hereby GRANTED.


 Entered: August 18, 2014.


s/ William C.  Lee
William C. Lee, Judge
United States District Court
